AUSA: Adam Sowlati

# 23 MAG 6311

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HIKMAT ABUZAHRIEH,<br><br>Defendant. | **SEALED COMPLAINT**<br><br>Violations of<br>18 U.S.C. §§ 371, 641, and 2<br><br>COUNTY OF OFFENSE:<br>BRONX |

SOUTHERN DISTRICT OF NEW YORK, ss.:

LUIGI STOLFA, being duly sworn, deposes and says that he is a Special Agent with the United States Department of Agriculture ("USDA"), and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Theft of Government Funds)

1.      From at least in or about June 2021 through at least in or about August 2023, in the Southern District of New York and elsewhere, HIKMAT ABUZAHRIEH, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, theft of government funds, in violation of Title 18, United States Code, Section 641.

2.      It was a part and an object of the conspiracy that HIKMAT ABUZAHRIEH, the defendant, and others known and unknown, knowingly would and did knowingly embezzle, steal, purloin, and convert to their own use and the use of another, and, without authority, sell, convey, and dispose of a record, voucher, money, and thing of value of the United States and of a department and agency thereof, to wit, the United States Department of Agriculture ("USDA"), which exceeded the sum of $1,000, and receive, conceal, and retain the same with intent to convert it to their use and gain, knowing it to have been embezzled, stolen, purloined, and converted, in violation of Title 18, United States Code, Section 641.

### Overt Acts

3.      In furtherance of the conspiracy, and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

        a.      On or about February 2, 2023, a co-conspirator ("Co-Conspirator-1"), in her capacity as a cashier of the grocery store (the "Grocery Store") located at 151 East Tremont Avenue, in the Bronx, New York, exchanged Supplemental Nutrition Assistant Program ("SNAP") benefits for cash at the request of a confidential source (the "CS"), who posed as a customer of the Grocery Store.

b.      On or about February 14, 2023, a co-conspirator ("Co-Conspirator-2"), in his capacity as an employee of the Grocery Store, exchanged SNAP benefits for cash at the request of the CS, who posed as a customer of the Grocery Store.

c.      On or about March 16, 2023, Co-Conspirator-1, in her capacity as a cashier of the Grocery store, and in the presence of HIKMAT ABUZAHRIEH, the defendant, exchanged SNAP benefits for cash at the request of the CS, who posed as a customer of the Grocery Store.

d.      On or about May 3, 2023, Co-Conspirator-1, in her capacity as a cashier of the Grocery store, exchanged SNAP benefits for cash at the request of the CS, who posed as a customer of the Grocery Store.

e.      On or about June 14, 2023, HIKMAT ABUZAHRIEH, the defendant, exchanged SNAP benefits for cash at the request of the CS, who posed as a customer of the Grocery Store.

f.      On or about August 2, 2023, HIKMAT ABUZAHRIEH, the defendant, exchanged SNAP benefits for cash at the request of the CS, who posed as a customer of the Grocery Store.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Theft of Government Funds)

4.      From at least in or about June 2021 up to and including in or about August 2023, in the Southern District of New York and elsewhere, HIKMAT ABUZAHRIEH, the defendant, knowingly embezzled, stole, purloined, and converted to his own use and the use of another, and, without authority sold, conveyed, and disposed of a record, voucher, money, and thing of value of the United States and of a department and agency thereof, to wit, the USDA, the value of which exceeded the sum of $1,000, and received, concealed, and retained the same with intent to convert it to his use and gain, knowing it to have been embezzled, stolen, purloined, and converted, to wit, ABUZAHRIEH fraudulently redeemed SNAP benefits that had not been used, as they were required to be used, to purchase food and other eligible items.

(Title 18, United States Code, Sections 641 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5.      I am a Special Agent with the USDA and I have been personally involved in the investigation of this matter.  During my time with the USDA, I have conducted numerous investigations into SNAP electronic benefit transfer ("EBT") trafficking by retailers who were authorized to redeem SNAP EBT benefits in exchange for the purchase of food, but who unlawfully redeemed SNAP EBT benefits in exchange for cash or the purchase of non-food items. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with other law enforcement officers, and my examination of reports, records, and video.  Because this affidavit is being submitted for the limited purpose of establishing probable

2

cause, it does not include all of the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

<u>The Supplemental Nutrition Assistance Program</u>

6.      Based on my training and experience as a USDA Special Agent, I know the following:

        a.      The Food Stamp Act of 1977, as amended, 7 U.S.C. § 2011 *et seq.*, established the Food Stamp Program, now known as SNAP.  The program is overseen by the USDA's Food and Nutrition Service ("FNS").

        b.      Recipients of SNAP assistance redeem their program benefits by using an EBT card to purchase eligible food items at authorized retailers.  The transfer of benefits is initiated when the recipient's card is swiped through an EBT terminal at the authorized retailer.  The recipient is then prompted to enter a personal identification number ("PIN") to access his or her SNAP account.  The SNAP system then verifies the PIN and either authorizes or denies the transaction, depending on the balance in the recipient's account.  If the transaction is approved, the recipient's account is debited for the amount of the purchase, and a bank account that the retailer has designated is credited for that amount.

        c.      Under Chapter 51, Title 7 of the United States Code, and regulations issued thereunder, SNAP benefits may be exchanged only for certain eligible food products.  According to USDA regulations, items such as cigarettes, hot foods for immediate consumption, and controlled substances are ineligible for purchase with SNAP benefits.  In particular, SNAP benefits may not be exchanged for cash.

        d.      To participate in SNAP, the owner or operator of a retail food store must first apply for authorization and complete an application.  If USDA approves the application, then the retailer is permitted to accept EBT cards from eligible SNAP recipients in exchange for the purchase of eligible food items.  In addition, before a store can redeem SNAP benefits, the store's owner or a designated representative must watch an instructional orientation DVD which is mailed to the retail food store with its SNAP license.  The pertinent rules and regulations relating to SNAP are explained in the instructional DVD.  In the application itself, SNAP rules and regulations are listed in bullet-point form on the last page.  A retail applicant is required to certify his or her understanding of the listed rules and regulations, including the rules prohibiting the exchange of SNAP benefits for ineligible items.

## Overview of the Scheme

7.      From my participation in this and other similar investigations, I have become familiar with a scheme in which retailers unlawfully accept SNAP benefits from customers in exchange for cash and ineligible items.  In this scheme, the Grocery Store employee debits a customer's EBT card for an amount that supposedly represents the price of a purchase of food. These purported food purchases, however, actually involve the unlawful exchange of SNAP benefits for cash and ineligible items.  The retailer debits the customer's EBT card, often for an

amount that substantially exceeds the value of cash and other items that the customer is given.  For example, a SNAP recipient who asks a retailer for $50 in cash might pay as much as $100 in SNAP EBT benefits.

8.      As detailed below, I believe that HIKMAT ABUZAHRIEH, the defendant, conspired with others to earn, from at least in or about June 2021 through at least in or about August 2023, at least approximately $6 million in fraudulently obtained SNAP benefits. ABUZAHRIEH controlled the Grocery Store and directed employees to debit customers' SNAP EBT cards in exchange for cash.  ABUZAHRIEH additionally controlled the proceeds of the scheme when the fraudulently obtained SNAP EBT benefits were deposited into the Grocery Store's bank account.

<u>The Grocery Store</u>

9.      Based on my participation in this investigation, I know that the Grocery Store is a large grocery store or supermarket located at 151 East Tremont Avenue in the Bronx, New York. As shown below, a sign above the Grocery Store states: "Compare Foods."  Underneath, there is a banner that says: "ACCEPTED: EBT • FOODSTAMPS • FRUITS & VEGETABLES PRODUCE • MEAT • DAIRY • FROZEN PRODUCTS • DELI • BAKERY."



10.      Based on my review of USDA records, I know that, in or about June 2019, HIKMAT ABUZAHRIEH, the defendant, applied for and received authorization to participate in SNAP under the business name "151 E. Tremont Food Corp/Compare Foods," at the address 151 East Tremont Avenue, in the Bronx, New York.

## The Investigation

11.     Based on my review of FNS data, from in or about June 2021 through in or about August 2023, I have seen a number of indicators that, based on my training and experience, are indicative of EBT fraud:

a.     Based on my training and experience, I know that purchases over $50 at the Grocery Store are indicative of EBT fraud because of the type and quantity of products sold at the Grocery Store and because of how the Grocery Store compares to similarly situated stores.  From in or about June 2021 through in or about July 2023, approximately 31% of the Grocery Store's SNAP EBT transactions were over $50.  In total, from in or about June 2021 through in or about August 2023, the Grocery Store had $6,525,293.89 EBT transactions over $50.

b.     Between in or about June 2021 and in or about July 2023, the average EBT purchase at the Grocery Store was $53.55 (as calculated each month).  During the same period, the average EBT transaction at stores classified as "supermarket" in the Bronx was $39.50.  The average EBT transaction at stores classified as "supermarket" in New York State was $42.57.

c.     Between in or about June 2021 and August 2023, the Grocery Store recorded approximately $8,419,526.33 in SNAP EBT purchases.  Compared on a month-to-month basis, the total amount of SNAP EBT purchases at the Grocery Store were generally 36% greater than average for stores classified as "supermarket" in the Bronx and 26% greater than the average for stores classified as "supermarket" in New York State.

12.     Based on my interviews of the CS, review of footage recorded from a hidden camera worn on the person of the CS, and my review of purchase receipts, I know that, from in or about February 2023 through in or about August 2023, the CS[1] engaged in six SNAP EBT transactions at the Grocery Store.  In each case, either the cashier, an employee, or HIKMAT ABUZAHRIEH, the defendant, exchanged EBT benefits for cash:

a.     On or about February 2, 2023, the CS entered the Grocery Store and picked up a box of mini cakes priced at $5.69.  The CS then walked to the cash register and gave Co-Conspirator-1, the cashier at the time, the mini-cakes and additionally asked for $10 in cash.  The CS then swiped her EBT card.  Co-Conspirator-1 gave the CS the mini-cakes and $10 in cash and charged the CS's EBT card $22.93.

b.     On or about February 14, 2023, the CS entered the Grocery Store and picked up a box of mini cakes priced at $5.69.  The CS then walked to the cash register and gave Co-

---

[1] The CS received monetary compensation from law enforcement for the CS's participation in each transaction described in this Complaint.  Based on my interview of the CS, I know that, in the early 1990s—when the CS was a teenager—she was arrested on two separate incidents: once in relation to a domestic violence dispute with her sister and another time for shooting someone accidentally.  She told me she was never convicted of a crime in relation to either incident, which is confirmed from my review of police records.  In addition, in or about 2019, the CS was arrested for possessing marijuana in her vehicle.  She was not convicted of a crime in relation to this incident, which is confirmed from my review of police records.

Conspirator-1, the cashier at the time, the mini-cakes and additionally asked for $100 in cash.  The CS then swiped her EBT card and was charged $171.03.  Co-Conspirator-1 gave the CS the mini-cakes and handed the receipt to Co-Conspirator-2, another employee of the Grocery Store, who went to a back room.  Co-Conspirator-2 then returned and gave $100 in cash to the CS.

       c.   On or about March 16, 2023, the CS entered the Grocery Store and picked up a bag of coffee priced at $4.50.  The CS then walked to the cash register and gave Co-Conspirator-1, the cashier at the time, the bag of coffee and additionally asked for $100 in cash.  The CS then swiped her EBT card.  Co-Conspirator-1 gave the CS the bag of coffee and $100 in cash and charged the CS's EBT card $169.99.  As can be seen below, a person I believe to be ABUZAHRIEH was standing behind Co-Conspirator-1 and observing the transaction:



       d.   On or about May 3, 2023, the CS entered the Grocery Store and picked up a sports drink priced at $1.99.  The CS then walked to the cash register and gave Co-Conspirator-1, the cashier at the time, the sports drink and additionally asked for $100 in cash.  The CS then swiped her EBT card.  Co-Conspirator-1 gave the CS the sports drink and $65 in cash and charged the CS's EBT card $102.30.

       e.   On or about June 14, 2023, the CS entered the Grocery Store and picked up a bag of coffee priced at $4.50.  The CS then walked to the cash register and gave Co-Conspirator-1, the cashier at the time, the bag of coffee and additionally asked for $150 in cash.  The CS then swiped her EBT card and was charged $240.34.  Co-Conspirator-1 gave the CS the bag of coffee.  Co-Conspirator-1 then told the person I believe to be ABUZAHRIEH, in sum and substance, "150."  The person I believe to be ABUZAHRIEH, who had been observing the transaction, then walked to a back room, reemerged, and approached the CS, handing her $150 in cash.  A photograph of the person I believe to be ABUZAHRIEH approaching the CS, moments before handing her the cash, is below:



f.   On or about August 2, 2023, the CS entered the Grocery Store and picked up cans of tuna priced at a total of $5.74.  The CS then walked to the cash register and gave a co-conspirator ("Co-Conspirator-3"), the cashier at the time, the cans of tuna and additionally asked for $150 in cash.  After the CS swiped her EBT card, Co-Conspirator-3 told the CS that she only had a $67 balance on her EBT card.  The CS then asked for $50 instead.  The CS proceeded to swipe her EBT card again and was charged $65.74.  Co-Conspirator-3 handed the CS the cans of tuna.  The person I believe to be ABUZAHRIEH, who had been observing the transaction, then walked to a back room, reemerged, and approached the CS, handing her $35 in cash.  A photograph of the person I believe to be ABUZAHRIEH approaching the CS, moments before handing her the cash, is below:



<u>ABUZAHRIEH's Control of the Scheme's Profits</u>

13.   Based on my review of records from a financial institution ("Bank-1"), I have learned the following:

7

a.   In or about October 2019, a bank account (the "Bank Account") was opened at Bank-1 on behalf of "151 E Tremont Food Corp / DBA Compare Foods."

b.   The sole signatory for the Bank Account is HIKMAT ABUZAHRIEH, the defendant.

c.   Each month, there are many tens of thousands of dollars of deposits into the Bank Account from a third-party payment processor that I know, from my training and experience, processes payments for the SNAP EBT program.

## My Interview of ABUZAHRIEH

14.    On or about August 2, 2023, an USDA special agent and I went to the Grocery Store and interviewed the person I believe to be HIKMAT ABUZAHRIEH, the defendant.  The person I interviewed (the "Interviewee") appeared to me to be identical to the person depicted in the photographs in Paragraph 12, above.  During the interview, I did not reveal that the Grocery Store was under investigation; instead, I represented that the interview was for a routine USDA check-in of stores accepting SNAP EBT benefits.  From the interview, I have learned the following:

a.   The Interviewee said he was the manager of the Grocery Store and had worked at the Grocery Store since 2019.  The Interviewee additionally said he knew it was against the law to exchange SNAP benefits for cash or for ineligible items, and that he had trained all Grocery Store employees on the rules of the SNAP program.

b.   The Interviewee acknowledged that the Grocery Store uses Bank-1 for business and EBT transactions.

c.   The Interviewee denied that he was "Hikmat Abuzahrieh" said his name was actually "Steven Abuzahrieh."  The Interviewee said his brother is "Hikmat," the owner of the Grocery Store.

d.   I asked the Interviewee for identification, and he said he did not have any on his person or otherwise readily available.

15.    I believe I was lied to and that the Interviewee was HIKMAT ABUZAHRIEH, the defendant, for the following reasons:

a.   I asked the Interviewee for his social security number, date of birth, and address.  The information the Interviewee gave me for his social security number, date of birth, cellphone number, and address (recited from memory) matches what I know from my review of records provided by Bank-1 for the Bank Account and law enforcement databases to be the social security number, date of birth, cellphone number, and address for ABUZAHRIEH.

b.   I subsequently conducted another interview at the Grocery Store, this time of a person who purported to be the co-owner and co-manager (the "Co-Owner") of the Grocery Store.  The Co-Owner said his name is "Naiem" and that he is the brother of "Hikmat."  The Co-

owner said Hikmat goes by the nickname "Steven."  The Co-Owner showed me what appeared to be a social security card, which confirmed that the Co-Owner's name is "Naiem."

WHEREFORE, I respectfully request that a warrant be issued for the arrest of HIKMAT ABUZAHRIEH, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.


Luigi Stolfa (by VF with permission)
_____
Luigi Stolfa
Special Agent
United States Department of Agriculture


Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this  6   day of September, 2023.

_____
THE HONORABLE VALERIE FIGUEREDO
United States Magistrate Judge
Southern District of New York